Filed 3/15/22  Tuzzolino v. Windsor Twin Palms Healthcare etc. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| PAUL TUZZOLINO et al.,<br><br>    Plaintiffs and Respondents,<br><br>  v.<br><br>WINDSOR TWIN PALMS HEALTHCARE CENTER, LLC, et al.,<br><br>    Defendants and Appellants. | B315867<br><br>(Los Angeles County Super. Ct. No. 20STCV47447) |

APPEAL from an order of the Superior Court of Los Angeles County, Olivia Rosales, Judge. Affirmed.

Giovanniello Law Group, Alexander F. Giovanniello and Cadmus B. Wang for Defendants and Appellants.

Lanzone Morgan, Ayman R. Mourad and Alexander S. Rynerson for Plaintiffs and Respondents.

# INTRODUCTION

Plaintiff Pamala Tuzzolino signed an arbitration agreement purportedly on behalf of her deceased husband, Paul Tuzzolino, when admitting him to a skilled nursing facility.[1] Following Paul's discharge from the facility, Paul and Pamala sued the nursing facility, Windsor Twin Palms Healthcare Center, LLC dba Windsor Palms Care Center of Artesia, and its owners and operators, S&F Management Company, LLC and Windsor OMG Holding Company II, LLC (collectively, Windsor) for negligence and elder abuse.

Windsor filed a petition to compel arbitration under the arbitration agreement Pamala executed. The trial court denied Windsor's petition, concluding Pamala lacked authority to sign the agreement on Paul's behalf. We agree Pamala's execution of the arbitration agreement was unauthorized and accordingly, affirm.

# FACTUAL AND PROCEDURAL BACKGROUND

In April 2017, Paul executed a Durable Power of Attorney (DPOA) appointing Pamala as his agent for specified matters. As relevant here, subdivision "J" of the DPOA, titled "Personal and family maintenance," granted Pamala the authority "[t]o hire accountants, attorneys at law, consultants, clerks, physicians, nurses, agents . . . and to remove them, . . . and to pay and allow the persons so employed such salaries, wages, or other remunerations, as [Pamala] shall deem proper." The DPOA

---

[1]     We refer to Pamala and Paul by their first names to avoid confusion.

stated at the outset (in all caps): "This document does not authorize anyone to make medical and other healthcare decisions for you."

Paul was admitted to Windsor on January 21, 2019. In addition to other admission paperwork, Pamala executed an arbitration agreement purportedly on Paul's behalf as his "Legal Representative/Agent." The arbitration agreement stated (in boldface): "Residents shall not be required to sign this Arbitration Agreement as a condition of admission to this Facility."

Following Paul's discharge from Windsor on December 1, 2020, Pamala and Paul filed a complaint against Windsor, alleging causes of action for negligence and elder abuse. Paul died a few weeks after filing the original complaint. Pamala filed an amended complaint as Paul's successor in interest and in her individual capacity, alleging causes of action for elder abuse, violation of residents' Bill of Rights (Health and Saf. Code, § 1430, subd. (b)), and wrongful death.

Windsor filed a petition to compel arbitration. The trial court denied the petition, concluding Windsor failed to meet its burden of proving the existence of a valid arbitration agreement because Pamala lacked authority to enter into the agreement on Paul's behalf. It explained that Pamala executed the agreement "while making health care decisions on behalf of the [d]ecedent" in violation of the express terms of the DPOA. It further noted that "even under a theory of ostensible authority, no valid arbitration agreement exists."

Windsor timely appealed the order denying its petition.

## DISCUSSION

### A.     Governing Law and Standard of Review

We first address the threshold issue of whether federal or state law applies. Relying on section 1.7 of the arbitration agreement, Windsor contends the Federal Arbitration Act (FAA) applies. Section 1.7 states: "As this Agreement relates to the Resident's admission to the Facility, and the Facility, among other things, participates in the Medicare and/or Medi-Cal programs and/or procures supplies from out-of-state vendors, the parties acknowledge and agree that the Resident's admission and these other events evidence transactions affecting or involving interstate commerce governed by the [FAA.] This Agreement shall be construed and enforced in accordance with and governed by the [FAA] and the procedures set forth in the [FAA] shall govern any petition to compel arbitration." Pamala counters that California law applies, relying on section 1.1 of the agreement, which provides in relevant part: "It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this Agreement were unnecessary or unauthorized or were improperly, negligently or incompetently rendered or not rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings."

We agree with Windsor and the trial court that the FAA applies based on the express language of section 1.7. Section 1.1 was included in the agreement because it is required by the Code

4

of Civil Procedure.[2] It is not, as Pamala contends, a choice of law provision.

Even when the FAA applies, however, "the FAA relies on state-law contract principles" in determining whether an arbitration agreement exists. (*Peleg v. Neiman Marcus Group, Inc.* (2012) 204 Cal.App.4th 1425, 1466.) The central issue on appeal—i.e., did the DPOA confer authority on Pamala to enter into an arbitration agreement on Paul's behalf—presents a legal question. We therefore apply the de novo standard of review. (See *Lopez v. Bartlett Care Center, LLC* (2019) 39 Cal.App.5th 311, 317 [legal conclusions underlying a trial court's denial of a petition to compel arbitration are reviewed de novo].)

---

[2] Code of Civil Procedure section 1295, subdivision (a) states: "Any contract for medical services which contains a provision for arbitration of any dispute as to professional negligence of a health care provider shall have such provision as the first article of the contract and shall be expressed in the following language: 'It is understood that any dispute as to medical malpractice, that is as to whether any medical services rendered under this contract were unnecessary or unauthorized or were improperly, negligently or incompetently rendered, will be determined by submission to arbitration as provided by California law, and not by a lawsuit or resort to court process except as California law provides for judicial review of arbitration proceedings. Both parties to this contract, by entering into it, are giving up their constitutional right to have any such dispute decided in a court of law before a jury, and instead are accepting the use of arbitration.'"

**B.    Pamala Lacked Authority to Bind Paul to Arbitration with Windsor**

Windsor contends the DPOA granted Pamala actual authority to execute the arbitration agreement on Paul's behalf. Specifically, Windsor argues the language in subdivision (J) of the DPOA granting Pamala the authority to hire physicians and nurses conferred on Pamala the authority to admit Paul to Windsor and "to execute contracts on behalf of [Paul] required to hire the services of Windsor." We disagree.

The scope of a power of attorney depends on the language of the instrument, which is strictly construed. (*Tran v. Farmers Group Inc.* (2002) 104 Cal.App.4th 1202, 1214.) We are skeptical the authority to hire nurses and physicians is sufficiently broad to include the authority to place Paul in a nursing facility; the DPOA contains no terms authorizing Pamala to determine where Paul would live. Even assuming Pamala had such authority, however, it does not follow she possessed the authority to sign a voluntary arbitration agreement on Paul's behalf. Relying on Probate Code section 4262, subdivision (b), Windsor argues Pamala had the authority to execute the arbitration agreement because it was "incidental and necessary" to retain the services of Windsor.[3] But as Windsor acknowledges, execution of the arbitration agreement was not required for admission to Windsor; it plainly stated it was "not a precondition" for admission.

Moreover, Pamala asserts, and the trial court agreed, that Pamala executed the arbitration agreement while making health

---

3    Probate Code section 4262, subdivision (b) states an attorney in fact has "[t]he authority incidental, necessary, or proper to carry out the granted authority."

care decisions on behalf of Paul (i.e., the decision to admit Paul to a nursing facility) in direct contravention of the DPOA. We note there is conflicting case law on the issue whether the term "health care decisions" encompasses the execution of arbitration agreements by the agent at the time of the principal's admission into a nursing home. (See *Garrison v. Superior Court* (2005) 132 Cal.App.4th 253, 266 (*Garrison*) [holding the agent's decision to enter into arbitration agreements at the time of the principal's admission into a nursing home was a health care decision]; compare with *Young v. Horizon West, Inc.* (2013) 220 Cal.App.4th 1122, 1129 [the *Garrison* court "express[ed] the view that the term 'health care decisions' made by an agent encompasses the execution of arbitration agreements on behalf of the patient. So broad an interpretation of 'health care decisions' seems unnecessary to the result in *Garrison*, and to the extent that the court intended such a general application, we disagree with its conclusion."].) We need not resolve this issue, however. Windsor concedes Pamala was making healthcare decisions on Paul's behalf when she executed the arbitration agreement.[4] Thus, Pamala's execution of the arbitration agreement violated the express term of the DPOA stating it "does not authorize anyone to make medical and other health-care decisions for [Paul]."

---

[4]     Windsor argues in its opening brief: "[Pamala's] authority to not just pay but to hire healthcare providers conferred upon her the authority to make healthcare decisions, and by extension, the authority to enter into the Arbitration Agreement." Windsor does *not* argue that execution of an arbitration agreement is outside the scope of "health care decisions."

Accordingly, we agree with the trial court that Pamala lacked actual authority to execute the arbitration agreement on Paul's behalf. Not only does the DPOA lack express terms authorizing Pamala to do so, but it expressly *prohibits* Pamala from making health care decisions on Paul's behalf.[5]

This conclusion does not, as Windsor contends, discriminate against arbitration contracts in violation of the FAA. This court recently rejected this exact argument in *Garcia v. KND Development 52, LLC* (2020) 58 Cal.App.5th 736, 744. In *Garcia*, we explained: "[T]he Supreme Court has recognized that the FAA does not preempt generally applicable state law conditioning the validity of an arbitration agreement executed by a purported agent—like any other contract executed by a purported agent—on an adequate evidentiary showing that the agreement falls within the scope of authority, if any, conferred by the principal. Here, the trial court relied on such generally applicable law. It neither articulated nor implied any requirement applicable only to arbitration contracts, or to contracts sharing their defining traits. We cannot infer discrimination from the mere fact that the court's ruling was limited to appellants' arbitration agreements, as only those agreements were at issue on appellants' petition." (*Garcia, supra*, 58 Cal.App.5th at p. 747.) Windsor does not cite, much less attempt to distinguish, *Garcia*. In this case, as in *Garcia*, the trial court applied generally applicable state law conditioning the validity of an arbitration agreement executed by a purported

[5] As noted above, the trial court also held Pamala lacked ostensible authority to execute the arbitration agreement. Windsor does not contend the trial court erred in reaching this conclusion.

8

agent on an adequate showing that the agreement falls within the scope of authority of the DPOA.

We therefore conclude the trial court's denial of Windsor's petition to compel arbitration is consistent with the FAA.

## C. The Trial Court Was Correct in Not Delegating to an Arbitrator the Issue Whether an Arbitration Agreement was Formed

Alternatively, Windsor contends the trial court erred by not enforcing the delegation clause in the arbitration agreement. Section 1.5 of the arbitration agreement states: "The arbitrator, and not any federal state, or local court or agency, shall have the exclusive authority to resolve any Dispute relating to the interpretation, applicability, enforceability, or formation of this Agreement, including, but not limited to, any claim that all or any part of this Agreement is void or voidable."

Before a delegation clause can be enforced, however, the court determines whether a valid arbitration agreement exists. (See *Henry Schein, Inc. v. Archer & White Sales, Inc*. (2019) __ U.S. __, __ [139 S.Ct. 524, 530] ["To be sure, before referring a dispute to an arbitrator, the court determines whether a valid arbitration agreement exists."].) Here, by arguing Pamala lacked authority to execute the arbitration agreement on Paul's behalf, Pamala disputed the formation of a valid agreement. Thus, whether Pamala had authority to enter into the agreement on Paul's behalf was for the court to decide.

9

## DISPOSITION

The order is affirmed. Pamala is awarded her costs on appeal.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**


CURREY, J.


We concur:


MANELLA, P.J.


COLLINS, J.


10